```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION


   KIRK MEYERS,                     )
                                    )
             Plaintiff,             )
                                    )
        v.                          )    No. 13 C 7045
                                    )
   SHEET METAL WORKERS' LOCAL       )
   NO. 73 PENSION FUND,             )
                                    )
             Defendant.             )
```

MEMORANDUM OPINION AND ORDER

Kirk Meyers ("Meyers") has sued the Sheet Metal Workers' Local No. 73 Pension Fund ("Fund") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover benefits allegedly owed to him under a disability pension plan.

The parties have filed cross motions for summary judgment. I grant Meyers's motion and deny the Fund's cross motion for the reasons stated below.

I.

At all relevant times, Meyers was a member of the Sheet Metal Workers' International Association, Local Union No. 73 ("Union"). Since 1985, Meyers has performed sheet metal work for several employers who were contractually required to contribute to the Fund based on the number of hours he worked.

1

The Fund, in turn, administers the Sheet Metal Workers Local No. 73 Pension Plan ("Plan"). Among other benefits, the Plan provides disability pensions to participants who have earned a sufficient number of credits. Meyers could earn up to one pension credit each calendar year if he worked at least 1,200 hours for contributing employers. He could also receive up to two pension credits for any disability arising in covered employment for which he received workers' compensation benefits.

On September 14, 2005, while working for a contributing employer, Meyers's right foot was crushed by a 4,000 pound lift driven by another employee. After the injury, Meyers continued to work for contributing employers until December 2005. R. 558-59. He stopped working in December 2005 and remained off work until April 2006 because of his injury. R. 559. Meyers received workers' compensation benefits during this four to five month period, for which he received 760 hours or seven-twelfths of a pension credit. *Id*.

Meyers resumed working for contributing employers in April 2006 and earned a full pension credit in 2006 and 2007. R. 558-59. In 2008, however, Meyers earned no pension credit because he worked only 70.5 hours for contributing employers. R. 559. His only other period of covered employment was in February 2009 when he worked 107.5 hours, which was enough to earn one-twelfth of a pension credit. *Id*.

2

In July 2008, as his hours of covered employment were dwindling, Meyers applied for a disability pension based on the injuries he sustained in September 2005. Section 3.9 of the Plan provides that:

> (a) A Participant shall be eligible for a Disability Pension if he meets the following requirements:
>
> (i) He becomes Totally and Permanently Disabled;
>
> (ii) He has at least 10 Pension Credits of which at least 4 were earned during the Contribution Period;
>
> (iii) He earned at least 1/2 Pension Credit in Covered Employment during the Contribution Period within the twelve-month period immediately preceding the time he became Totally and Permanently Disabled; [and]
>
> (iv) After January 1, 1990, he has not at any time performed any employment in the Sheet Metal Industry at a position not covered by a Collective Bargaining Agreement between the Union and the Employee.

R. 627. Only the first and third requirements are at issue in this case.

In order to determine whether a pension applicant is "totally and permanently disabled," the Plan requires applicants to "submit to an examination by a competent physician or physicians selected by the Trustees." R. 629. The Fund selected Dr. Steven DeAngeles, M.D., to examine Meyers in July 2008. After acknowledging Meyers's complaints about persistent

3

pain in his right foot, Dr. DeAngeles stated, "I don't doubt the patient's description of his pain but I was unable to objectively identify a cause for this pain." Pl.'s Ex. D. Therefore, in Dr. DeAngeles's opinion, Meyers was not totally and permanently disabled. *Id.*

An initial review committee denied Meyers's pension application in August 2008. Meyers appealed the committee's decision to the Fund's Board of Trustees ("Trustees"), which was comprised of three Union representatives and three employer representatives. The Trustees rejected Meyers's appeal in November 2008 because a recent functional assessment showed that he could perform work at the medium to heavy physical demand level, which included sheet metal work. *See* Pl.'s Ex. C. Meyers declined to seek judicial review of the Trustees' decision.

In April 2011, over two years after he last performed sheet metal work, Meyers reapplied for a disability pension. Meyers identified September 2005 as the date when he first became disabled with complex regional pain syndrome ("CRPS").[1] R. 555.

---

[1] Complex regional pain syndrome that does not involve nerve damage is known as Type 1 CRPS, "reflex sympathetic dystrophy syndrome," or "RSD." *See Complex Regional Pain Syndrome*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/basics/causes/con-20022844 (last visited Feb. 17, 2015).

In support of his application, Meyers submitted his work history and the six medical records:

1. a May 27, 2008 letter from Dr. Tariq Malik, M.D., of the University of Chicago Hospitals in which he diagnosed Meyers with "right foot neuropathic pain versus RSD" and "right foot neuropathic pain versus CRPS" (R. 562);

2. a July 23, 2009 report from Dr. Rodney Stuck, D.P.M., of Loyola University in which he reached the same diagnoses as Dr. Malik (R. 563);

3. an August 31, 2010 functional capacity evaluation by Elizabeth Patterson, a licensed athletic trainer, concluding that Meyers could perform jobs at the medium physical demand level (R. 564-72);

4. a March 12, 2011 letter from Susan Entenberg, a certified rehabilitation counselor, concluding that Meyers could not perform the duties of a sheet metal work because he could not stand, walk, or maintain his balance for prolonged periods of time or climb frequently (R. 573-4)

5. a March 21, 2011 letter from Dr. O. Ramsey, M.D., concluding that Meyers experienced a "significant amount of pain" while performing medium to heavy duty work and opining that his chances of resuming sheet metal work were "very slim due to his pain and limited endurance" (R. 575); and

6. an April 12, 2011 letter from Dr. Stuck in which he released Meyers to perform "half day work" at the medium physical demand level because his foot pain varied from day to day (R. 576).

Meyers asked the Fund to grant him a disability pension "dating back to December 2007 which is the date I conceded I could no longer perform my duties as a sheet metal worker. I couldn't tolerate the pain I suffered any longer." R. 561. He described his "failed attempt to continue as a sheet metal

worker" as "heart breaking" and explained that he was working towards a degree in facilities management. *Id*.

The Trustees once again selected Dr. DeAngeles to examine Meyers. Meyers reported to Dr. DeAngeles that he had been diagnosed with CRPS and presented "a chronological timelines of events that appears to be suggestive of his diagnosis." R. 557. Before discussing the medications Meyers was taking, Dr. DeAngeles remarked that his evaluation of Meyers in April 2011 was "no different than it was on the 2008 visit." *Id*. Meyers remained on medications that were, in Dr. Angeles's words, "consistent with regional pain syndrome disorder." *Id*. Dr. DeAngeles also noted that Meyers's medical records from Loyola University "confirm[ed] the diagnosis of RSD." *Id*. In sum, "[b]ased on the diagnosis of RSD/RPS 1", Dr. DeAngeles "approv[ed] total disability dating back to February 2009 when the pain significantly worsened." *Id*. Dr. DeAngeles did not specify what evidence, if any, supported his conclusion that Meyers's pain worsened in February 2009.

A committee comprised of two union trustees and one employer trustee reviewed Meyers's disability pension application de novo on May 26, 2011. R. 580-82. Among other requirements, the Plan provides that participants are eligible for a disability pension only if they have earned at least one-half of a pension credit in the twelve month period immediately

6

preceding the diagnoses of a disability.  R. 627.  Meyers had received only one-twelfth of a pension credit in the twelve months before February 2009, which the committee accepted as the date when he became disabled.  Therefore, the committee denied Meyers's application for a disability pension.  R. 584.

On October 11, 2011, Meyers appealed the committee's decision to the Board of Trustees.  R. 588-89.  He submitted a "binder of medical records" and a journal recording his subjective complaints of pain from December 2006 to November 2008.[2]  R. 552.  Meyers also argued that, assuming he became disabled in February 2009, the Fund should have awarded him pension credit during the preceding twelve months because he received workers' compensation benefits during that period.  R.

---

[2] R. 135 (Feb. 2008 progress note in which Meyers reports "further problems with pain in his foot"); R. 134-35 (Apr. 2008 progress note reporting that Elavil and Neurontin were not relieving Meyers's foot pain); R. 142 (May 2008 referral letter documenting Meyers's complaint of "a four inch band of pain that wraps around his right mid-foot" and gets worse during activities such as standing and walking); R. 145-46 and 148-49 (June 2008 clinic notes describing right lumbar sympathetic block procedure performed on Meyers to alleviate right foot pain); R. 151-52 (July 2008 clinic note reporting minimal pain relief from sympathetic blocks and describing trigger point injection performed on Meyers's right lower extremity); R. 153-54 (Sept. 2008 clinic note concluding that "due to the prolonged state of the current symptoms, it is unlikely that [Meyers] is going to gain significant improvement in his symptoms"); R. 159-60 (Oct. 2008 clinical note reporting that Meyers's pain had diminished, but was still "constant" and exacerbated by activity); R. 133-34 (Nov. 2008 progress reporting that Meyers thought he was "unable to maintain a sustained routine to work due to his pain levels which get worse over the course of weeks or so").

7

589. In support of this argument, Meyers submitted excerpts from an August 2011 arbitration decision from the Illinois Workers' Compensation Commission ordering a contributing employer to pay him "the temporary total disability benefits that have accrued from 9/14/2005 through 7/14/2011." R. 591. Meyers argued that the Fund should retroactively award him the unused portion of his two credit allowance under Section 4.1(d)(i)(B) of the Plan for the time when he was receiving workers' compensation benefits.[3]

At a meeting on February 15, 2012, the Trustees deadlocked on whether to grant Meyers a disability pension. R. 550. The Union Trustee voted to grant Meyers the pension while the Employer Trustee voted to deny the pension. *Id*. In a letter dated February 20, 2012, the Fund informed Meyers that his appeal had been denied because of the deadlocked vote. R. 551. The Fund determined that Meyers's disability started in February 2009 based on three factors: (1) Meyers last performed sheet metal work for a contributing employer in February 2009; (2) Dr. DeAngeles identified February 2009 as the start of Meyers's

---

[3] Meyers admits that he did not provide the Trustees with the portion of the arbitrator's decision showing that he was entitled to 39.42 weeks of workers compensation benefits--which exceeds the 1,200 hour threshold necessary to earn one pension credit--between February 1, 2008 and January 31, 2009. *See* Dkt. No. 23 at 4 n.2 (admitting that the chart at "K MEYERS 000558-59" was not part of the administrative record before the Trustees).

8

disability; and (3) Meyers received workers' compensation benefits for a *temporary* disability between September 2005 and July 2011 whereas the Plan required his disability to be total and permanent.  R. 552.

As for Meyers's argument that the Fund should have awarded him pension credit starting in 2008 for the unused portion of the two credit allowance for the receipt of workers' compensation benefits, the Trustees said:

> [T]he Fund has a longstanding and consistent policy of crediting time under Section 4.1(d)(i)(B) on the earliest dates for which Workers' Compensation benefits were received until the maximum of two years of such credit is awarded.  Thus, this credit was exhausted prior to February 2008 and cannot be used to meet the 1/2 pension credit rule under these circumstances.

R. 553.

Having exhausted his administrative remedies, Meyers sued the Fund under ERISA to obtain disability pension benefits.  *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 613 (2013) (explaining that judicial review of an adverse benefits determination is "the second tier of ERISA's remedial scheme").  The parties have filed cross motions for summary judgment on Meyers's denial of benefits claim.

## II.

"As with any summary judgment motion, [I] review cross-motions for summary judgment 'construing all facts, and drawing

9

all reasonable inferences from those facts, in favor of the non-moving party.'" *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (quoting *Wis. Central, Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted).

"[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When the administrator has such discretionary authority, as the vast majority now do, the [reviewing] court applies a more deferential standard, seeking to determine only whether the administrator's decision was 'arbitrary and capricious.'" *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).

The parties agree that the Plan confers sufficient discretion on the Trustees to trigger arbitrary and capricious

review.  Meyers argues, however, that I should apply a heightened form of arbitrary and capricious review because the Supreme Court has held that a conflict of interest exists whenever an ERISA plan administrator "both evaluates claims for benefits and pays benefits claims."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-15 (2008).  The Seventh Circuit has rejected the argument that *Glenn* requires courts to "apply a heightened standard of review whenever a plan administrator is...also the payor of benefits."  *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009) (collecting cases).  Instead, "[t]he *likelihood* that the conflict of interest influenced the [plan administrator's] decision is...the decisive consideration" in deciding whether to apply a heightened form of arbitrary and capricious review.  *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009).

The Fund maintains a structural safeguard against biased decision-making by having an equal number of Union and Employer Trustees on its Board.  *See* 29 U.S.C. § 186(c)(5)(B) (requiring union-established trust funds to be administered such that "employees and employers are equally represented in the administration of such fund").  The Seventh Circuit has held, post-*Glenn*, that "a conflicts analysis [is] not [even] necessary when the plan at issue [is] a multi-employer welfare plan whose trustees consisted of an equal number of union and employer

11

representatives, whose union representatives had 'no discernible incentive to rule against an applicant,' and whose trustees were unanimous in their ruling." *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 1000-01 (7th Cir. 2013) (quoting *Manny v. Central States, SE and SW Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 243 (7th Cir. 2004)).[4]

Although the Trustees were not unanimous in denying Meyers's appeal, *Thompkins* does not require a heightened form of arbitrary and capricious review whenever union and employer trustees deadlock on whether to grant a disability pension. More importantly, Meyers has not presented evidence that the evaluator/payor conflict of interest influenced the Employer Trustee's vote to deny him a pension. "No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic*, 609 F.3d at 140. Because there is no evidence raising a "suspicion of partiality" in this case, Meyers's claim remains subject to the non-heightened form of arbitrary and capricious review. *Thompkins*, 712 F.3d at 1001.

---

[4] *Contra Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 n.4 (2d Cir. 2010) (describing *Manny* as "outdated" and holding that a conflicts analysis is necessary even when an equal number of employer and employees representatives administer an ERISA pension fund).

12

III.

On the merits, Meyers argues that the Trustees arbitrarily selected February 2009 as the date when he became "totally and permanently disabled" as that term is defined in the Plan. Alternatively, Meyers contends that even if his disability started in February 2009, the Trustees should have awarded him at least one-half of a pension credit in the preceding twelve months because he received workers' compensation benefits during that period.

A.

In the first instance, Meyers's pension claim turns on when he became disabled. Section 3.11 of the Plan provides:

> A Participant shall be deemed to be Totally and Permanently Disabled only if the Board of Trustees shall determine on the basis of medical or similar evidence that:
>
> (a) such Participant is totally unable, as a result of bodily injury or disease, to engage in or perform the duties of a Sheet Metal Worker or other employment in the construction industry for remuneration or profit and does not engage in or secure any other employment or gainful pursuit, except for an activity (so long as that activity does not involve work as a Sheet Metal Worker or employment in the construction industry) at which he earns less than $35,000 per year ($1,000 per month prior to January 1, 2006), subject to the limitations of Section 6.7(a) of the Plan; and

> (b) Such disability will be permanent and continuous for the remainder of his life.

R. 628-29.

The Plan does not define "the duties of a Sheet Metal Worker," but the Trustees listed the following five factors in their November 2008 denial of Meyers's first appeal:

> If a [P]articipant cannot perform any one of the following five abilities then the Participant may be considered to be Totally and Permanently Disabled.
>
> 1. Ability to stand for extended periods of time
>
> 2. Ability to lift 30 pounds above head
>
> 3. Ability to climb stairs and ladders on a frequent basis; at least 3 to 4 times per day
>
> 4. Ability to kneel and/or crawl on a frequent basis
>
> 5. Ability to work with hand tools (shears, hammer) up to 6 hours per day.

Pl.'s Ex. C.

After quoting the Plan's definition of "totally and permanently disabled," the Trustees rejected September 2005 as the date when Meyers became disabled because he worked for contributing employers after that date until February 2009. *Id*. The Trustees also stated that Dr. DeAngeles had determined on "two separate occasions" that Meyers did not become disabled

14

until February 2009.[5]  *Id*.  Finally, the Trustees noted that Meyers had received workers' compensation benefits for a temporary disability between September 2005 and July 2011 whereas the Plan required his disability to be total and permanent.  *Id*.

Meyers's burden is to show that the Trustees' selection of February 2009 as the date when he first became disabled was arbitrary and capricious in light of the evidence he presented. "[P]rocedural reasonableness is the cornerstone of the arbitrary-and-capricious inquiry."  *Majeski*, 590 F.3d at 484. "[A] plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial [medical] evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue."  *Id*.  The Fund must "provide a reasonable explanation for its determination and...address any reliable, contrary evidence presented by the claimant."  *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009).

Measured against these standards, the Trustees' conclusion that Meyers first became disabled in February 2009--as opposed to September 2005, the only other date they considered--was an

---

[5] The record shows that Dr. DeAngeles identified February 2009 as the date of Meyers's disability on only one occasion (i.e., in April 2011).  His other examination of Meyers occurred before February 2009.

15

arbitrary and artificially binary choice.  The Trustees did not address any of the six medical records that Meyers submitted with his original application.  Significantly, the Trustees did not explain why Dr. Malik's report from May 2008 in which he diagnosed Meyers with CRPS in his right foot was insufficient evidence that he could no longer perform the specific duties of a sheet metal worker listed in the November 2008 denial of Meyers's first appeal.

Meyers essentially stopped performing sheet metal work after December 2007.  R. 560.  As Meyers explained in his pension application, by the end of 2007, he "couldn't tolerate the pain [he] suffered any longer."  R. 561.  His complaints of pain in 2008 also appear in the numerous medical records and journal entries submitted to the Trustees on appeal, all of which the Trustees failed to address.  *See supra* at n. 2.  The Trustees could not ignore Meyers's complaints of pain simply because they were subjective.  *See Hawkins v. First Union Corp.*, 326 F.3d 914, 919 (7th Cir. 2003).  Moreover, the 107.5 hours Meyers worked in February 2009 do not preclude a finding that he was disabled before that date.  *Id*. at 913 ("A desperate person might force himself to work despite an illness that everyone agreed was totally disabling.").

In short, the Trustees decided that Meyers became disabled in February 2009 without addressing any of the medical evidence

16

he had presented.  The Seventh Circuit has consistently reversed ERISA plan administers in similar circumstances.  *See Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1088 (7th Cir. 2012) (reversing denial of disability benefits where plan administrator "failed to adequately explain why it gave more weight to [independent medical evaluation performed by its chosen physician] than to all of the medical evidence to the contrary produced by [claimant's] treating physician"); *Majeski*, 590 F.3d at 483 (reversing denial of disability benefits where plan administrator "[did] not acknowledge, much less analyze, the significant evidence of functional limitations that [claimant] offered"); *Leger v. Tribune Co. Long Term Disability Benefits Plan*, 557 F.3d 823, 835 (7th Cir. 2009) (reversing termination of disability benefits where plan administrator "failed to consider [claimant's] complete medical history and rejected, without explanation, important aspects of [a functional capacity evaluation]"); *Love*, 574 F.3d at 396 (reversing termination of disability benefits where plan administrator failed to explain why it "chose to discredit the evaluations and conclusions of [claimant's] treating physicians").  Meyer's claim falls squarely within this line of cases holding that it is arbitrary for an ERISA plan administrator to terminate or deny disability benefits without addressing the claimant's medical evidence.

B.

"When a plan administrator does not give adequate reasoning for its decision, [courts] normally remand the case so that the administrator can make further findings or provide additional explanation." *Schane v. Int'l Bhd. of Teamsters Union Local No. 710 Pension Fund Pension Plan*, 760 F.3d 585, 592 (7th Cir. 2014). A court may, however, award benefits "in cases where the evidence is 'so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground.'" *Love*, 574 F.3d at 398 (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996)).

This is not a case where the medical evidence establishes beyond dispute the precise date when Meyers became "totally and permanently disabled" under Section 3.11 of the Plan. Therefore, a remand to the Fund is the appropriate remedy. Because the date when Meyers became disabled is still an open question, I cannot decide at this stage whether he earned at least one-half of a pension credit in the twelve month period before an undetermined date.

The Fund's obligation to address Meyers's medical evidence on remand is "a question of degree." *Majeski*, 590 F.3d at 484 (noting that plan administrator need not "annotate every paragraph of a thousand-page medical record"). At a minimum, the Fund must explain why it finds Meyers's medical evidence

18

unreliable or insufficient to render him disabled on a date before February 2009. See *Leger*, 557 F.3d at 835.

IV.

I grant Meyers's motion for summary judgment and deny the Fund's cross motion for the reasons stated above. The case is remanded to the Fund for further proceedings consistent with this opinion.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: February 27, 2015